UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC HOUSTON,<br><br>                                        Plaintiff,<br><br>                    -against-<br><br>EQUINOX HOLDINGS, INC., EQUINOX-76ᵀᴴ STREET, INC., KELLY BAKER, KELSEY DIGNES, DIANNA SCOTECE, and ALFRED KOHART<br><br>                                        Defendants. | Index No. 25-cv-6884<br><br><br><br>COMPLAINT<br>JURY TRIAL DEMANDED |

Comes now Plaintiff Eric Houston, by and through his attorney, Geoffrey Kalender of GEOFFREY

KALENDER, PC, and hereby alleges as follows:

## NATURE OF THE ACTION

1. This action arises from a pattern of unlawful discrimination and retaliation against Plaintiff Eric Houston ("Houston"), a 68-year-old male personal trainer employed by Defendant Equinox Holdings, Inc. ("Equinox"). Despite his exemplary performance, Houston faced age discrimination and retaliation from Equinox management, including by Defendants Baker, Dignes, and Kohart; and sexual harassment and retaliation by coworker Dianna Scotece ("Scotece") that Equinox and other defendants knew of and allowed to continue.

2. After reporting this age discrimination and sexual harassment on multiple occasions, Houston was terminated based on pretextual reasons, with Scotece—the very person about whom he had complained for years—providing the complaint that led to his termination. Following his termination, Defendants further retaliated against Houston by seeking to enforce overbroad and unlawful non-compete and non-solicitation agreements which interfere with his right to work and earn a living in his chosen profession, while not enforcing similar agreements against other former trainers.

3. The treatment Houston endured demonstrates how even high-performing employees can be

pushed out of their careers because of discriminatory attitudes about age. Houston is a former Grammy-nominated concert pianist, award-winning playwright, and successful author and co-author. After turning to personal training at age 62, Houston worked diligently to build his client base, achieving a quantitatively high status among thousands of trainers company-wide. Rather than being celebrated for this achievement, his success was viewed as problematic by the newer management team which did not like the image of a then almost 70 year-old man as the gym's most prominent trainer.

4. The newer set of managers made explicit derogatory comments about his age, worked to undermine his success with clients and reputation with coworkers until he complained to management about the discrimination and was promptly terminated for pretextual reasons. Meanwhile, his complaints about sexual harassment and the retaliation he suffered were dismissed by management for over two years while he suffered, until he was terminated in an act of further discrimination and retaliation.

5. Defendants' actions were in violation of in violation of Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human Rights Law ("NYSHRL") N.Y. Exec. Law §§ 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Age Discrimination in Employment Act of 1967 ("ADEA") and Title VII of the Civil Rights Act of 1964 ("Title VII").

7. This Court has supplemental jurisdiction over Houston's state and city law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the events giving rise to the

claims occurred in the Southern District of New York.

9. Houston filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 12, 2025 (Charge No. 520-2025-05448) and received a Notice of Right to Sue on July 3, 2025. This Complaint is filed within ninety (90) days of receipt of said Notice.

**PARTIES**

10. Plaintiff Eric Houston is a resident of New York County, New York. Houston was employed by Defendant Equinox Holdings, Inc. as personal trainer between 2019-2025. At the time of his termination, Houston was 68 years old.

11. Defendant EQUINOX HOLDINGS, INC. D/B/A EQUINOX FITNESS CLUB ("Equinox") is a foreign business corporation domiciled in Delaware which operates a large portfolio of fitness brands and owns over 135 locations within major cities across the United States. At all relevant times, Equinox was an employer within the meaning of the ADEA, Title VII, NYSHRL, and NYCHRL, with more than twenty (20) employees.

12. Defendant EQUINOX-76TH STREET, INC. is a domestic business corporation with a primary place of business located at 344 Amsterdam Ave New York, NY 10024-6917. New York County. EQUINOX-76TH STREET, INC. is a fitness club that services clients in New York City.

13. Defendant Kelly Baker was Equinox's West 76th Street location's Assistant Manager from 2021-2023 and then General Manager from January of 2023 until in or around January of 2025, and Houston's supervisor throughout her tenure. Upon information and belief, Baker was terminated in or around January of 2025 due to her actions as described in this Complaint. Upon information and belief, Baker is a resident of New York, New York.

14. Defendant Kelsey Dignes was the Personal Training Manager at Equinox's West 76th Street location and Houston's direct supervisor beginning in spring 2024 and until his termination. Upon information and belief, Dignes is a resident of New York, New York.

3

15. Defendant Diana Scotece was, at all relevant times, employed as a personal trainer at Equinox's West 76th Street location. Upon information and belief, Scotece is a resident of Hudson County, New Jersey.

16. Defendant Alfred Kohart was employed by Equinox's human resources department which is known as "People Services", starting in August of 2024. Upon information and belief, Kohart is a resident of Westchester County New York.

## FACTUAL ALLEGATIONS

### Initial Employment and Early Harassment (2019-2022)

17. Houston was hired by Equinox as a personal trainer at its West 76th Street location on January 14, 2019 at the age of 62.

18. Prior to becoming a personal trainer, Houston had a distinguished and multifaceted professional background. In his twenties, he was a concert pianist, earning a Grammy nomination. However, Houston was uncomfortable with the demands of public performance and turned his creative energy toward writing and became an award-winning playwright. Houston went on to establish himself as a sought-after ghostwriter and writer, penning critically acclaimed books. At 62, having maintained peak fitness through a lifetime of disciplined exercise and nutrition, Houston chose to share his knowledge by becoming a personal trainer at Equinox and similarly excelled.

19. Throughout his employment, Houston was an exemplary employee. By the end of 2024, Houston had achieved a ranking of 60 out of 2,300 trainers company-wide, improving from 147 in 2023. In December 2024, Houston completed 172 training sessions (the highest on record in a month at the club during his tenure) and earned approximately $130,000 in annual income for 2024, making him the top earner among personal trainers at the club. The next closest trainer completed only 98 sessions that month.

20. At the time of his termination, Houston was the oldest personal trainer at the club at 68 years old, with the next oldest trainer being roughly 61 years old. Most trainers at the club were in their 20s

4

and 30s. Equinox has employed roughly 30 trainers at a time since the end of Covid. At the time of his termination, Houston estimates he was one of four trainers over the age of 50.

21. Shortly after Houston's employment began in early 2019, Scotece began a pattern of sexual harassment. Upon meeting Houston, she immediately started flirting with him. However, Houston refused to engage with her. In retaliation for Houston's refusal to engage, Scotece began treating Houston poorly. During a demonstration before the staff, she called Houston up and inappropriately told him to "[j]ust stand there and look pretty," a belittling comment, given Houston's age.

22. From 2019-2022 Scotece regularly complained about some aspect of Houston's work to management, all in retaliation for his continued unwillingness to engage with her. None of these complaints were upheld. He was called into the managers' office roughly once a month. The managers would apologize, assuring him that he was doing excellent work, and to avoid Scotece as much as possible, acknowledging that she was the sole source of any complaints about him.

**Escalating Harassment and First Formal Complaints (2022-2023)**

23. In Spring 2022, Scotece interrupted Houston while he was with a client, derailing the session entirely and provoking the client to request that she be terminated.

24. Directly following this, Houston informed PT manager Fernando Avila that Scotece interfered with him and his client and misrepresented herself as a manager. Avila arranged a meeting for Houston with GM Matthew Colello. During this meeting, Houston was told that Scotece would have no interaction with Houston.

25. The following day, at Scotece's request, Houston met with her and Colello. During this meeting, Scotece apologized for interrupting him, but said "she didn't know that he was with a client" – which does not bear scrutiny – and "words were coming out of her mouth that she didn't know she was saying." Houston learned that Scotece had continued making complaints about his work

practices despite him not being called into meetings, but that management had begun dismissing these complaints after recognizing they were targeted due to personal reasons. At the end of the meeting, Scotece offered to continue the relationship as friends. However, Houston requested that there be as little interaction as possible between the two of them and both parties shook hands.

26. The following day, Scotece went out of her way to greet Houston, loudly calling out to him. Following this, Scotece began using her body offensively to harass Houston. For example, Scotece twice choose to sit as close to Houston as possible on a bench after finding him in empty rooms, forcing bodily contact upon and also forcing him to move. Scotece also began purposely interrupting Houston's sessions with his trainees, attempting to gain Houston's attention while simultaneously acting to frustrate his ability to complete the work.

27. Kelly Baker was promoted from Assistant General Manager to General Manager of the Equinox location in January of 2023, replacing Colello.

28. In late summer of 2023, Scotece blocked Houston's path to the bathroom in a manner that would force him to make significant bodily contact to pass. When Houston refused to do so, standing his ground until she left, Scotece expressed visible frustration.

29. In August 2023, Scotece again purposely stood in Houston's path when he was attempting to go to the advisor's office, staring him down and trying to force him to make physical contact so that he was again forced to either slide his body across hers to go past or to act submissive and turn around. Houston, wanting more than anything to be left alone, chose to give up what he was doing rather than engage with Scotece. When she saw this, she inexplicably said "[y]ou're welcome" before walking away in frustration.

30. Following the second bathroom incident, Houston contacted Rob Avalon, Equinox's Regional Director, to discuss Scotece's behavior, but was instructed to speak with Kelly Baker about the matter.

31. In early September 2023, Houston met with management regarding Dianna Scotece, the meeting attended by Defendant Baker, Assistant Manager Mark Lamar, and a manager known to Houston only as "Ali." During this meeting, Houston complained that Scotece had been sexually harassing him, despite her instructions to leave him alone. Houston brought up the point that had Scotece's behavior been directed at a woman Equinox would have immediately responded.

32. After hearing Houston's complaints, Baker's response was to claim that members and trainers along with Scotece had complained about Houston training with clients, which is irrelevant to his claims of harassment and retaliation. When Houston presented contradictory evidence, Ali admitted that only Scotece had complained.

33. The day after the meeting, Houston was called to meet with Baker and Lamar. He was told explicitly that Scotece would leave him alone. To Houston's knowledge, there was no investigation of his complaints.

34. Following this, Scotece redoubled her campaign against Houston, regularly interrupting Houston's sessions with no reason to do so, as if demonstrating he couldn't control her.

35. On November 27, 2023, Houston met with Chris Cooper of Equinox People Services, Kelly Baker, and Assistant Manager Mark Lamar at Houston's request. Houston again explicitly reported that Scotece's attention was motivated by her desire to sexually harass him, that it was sexual harassment, that she would "say anything to interact with [him]", and that "that if [he] were a woman and she were a man Equinox would have taken this report seriously." Houston was assured that Scotece would leave him alone.

36. Roughly six weeks later at the beginning of 2024, a follow-up Zoom meeting was held with Cooper, Baker, and Lamar. Cooper again assured Houston that Scotece had agreed to leave him alone.

37. During this meeting. Baker suddenly claimed three members had complained about Houston

working out with his clients. Houston expressed disbelief, noting this was the first he'd heard of these complaints. As member complaints were always addressed immediately, that Baker had allowed three complaints to accrue without taking any action made Houston skeptical of her claim. Both Cooper and Lamar appeared stunned by Baker's claim. Lamar later acknowledged to Houston that he knew Baker was being dishonest. Houston believes that Scotece was again responsible for any complaints about him.

38. Following this meeting Keith Allaway, Scotece's husband and an Equinox employee, aggressively interrupted Houston's conversation with a co-worker about technique, demeaning Houston, and forcing Houston to step away.

**Continued Harassment, Threatening Behavior and Emotional Distress (2024)**

39. In early 2024, Houston entered a room at Equinox to conduct a remote training session. Keith Allaway, who was in the room eating lunch, saw him and immediately became irate and screamed at Houston to "[g]et the fuck out of here until I'm out of the room." Houston felt frightened and humiliated and was almost forced to flee from the room. Houston then realized that his client was on videochat (Facetime) and pointed the camera to Keith so that his client would see exactly whom he was speaking with. Keith, caught in the act by a witness, turned pale and quickly fled the room.

40. Houston reported this threatening behavior to Mark Lamar, stating that he felt threatened and unsafe. Lamar responded that "Keith should be fired for that."

41. After this incident, Scotece avoided Houston for a few weeks. However, after seeing there would be no consequences for her husband's behavior she resumed her pattern of sexual harassment and retaliation.

42. Houston experienced some form of sexual harassment and retaliation monthly from Scotece following the meetings in late 2023, all of which had ended with assurances by Equinox that she

would leave Houston alone. Equinox's inability or unwillingness to control Scotece caused Houston significant emotional trauma. Equinox's unwillingness to stop Scotece and failure to discipline Allaway demonstrates the pretextual nature of its response in later terminating Houston based upon the same complaints he made about her behavior.

43. Houston recalls at least 10 separate occasions of sexual harassment and retaliation occurring between Spring 2024 and January 2025, following his complaints of sexual harassment by Scotece. During these incidents, Scotece exhibited a pattern of intentional and unwelcome sexually harassing behavior, including again using her body to offend Houston by twice coming upon him in an empty room and sitting tightly next to him with her body flush against his, once in the summer of 2024 and once on a morning in November of 2024, constituting unwanted physical contact. Houston was required to get up and leave the area, literally fleeing from his tormentor.

44. Scotece also interfered with Houston's client sessions with at least 11 different clients. She would interrupt his sessions with the clients, leer at him and loom over him while he was working and would give him a smug smile when he showed discomfort.

45. This pattern demonstrates a calculated strategy of harassment, evidenced by the fact that Scotece temporarily ceased this behavior after her husband threatened Houston, proving she could control her actions when motivated to do so. His complaints of sexual harassment appear to have motivated her increasingly aggressive behavior, which violated her explicit promise to Equinox People Services to avoid unnecessary interaction with Houston.

**Age Discrimination**

46. Defendant Kelsey Dignes started as manager in March-April 2024. During their first private meeting Houston informed her about the history with Scotece, leaving no doubt she was aware of the history between them. He also informed her about Allaway's threatening behavior, explaining that he felt targeted specifically because of his history with Scotece, Allaway's wife.

9

Houston's age was also discussed during this meeting.

47. When Houston later asked Dignes if she had addressed the issue with Allaway, she shook her head "no." Upon information and belief, Allaway was never disciplined for this behavior.

48. Beginning around this time, the Spring of 2024, Houston noticed significant changes in how his performance was recognized. Management stopped announcing the number of sessions each trainer completed at monthly meetings, which Houston consistently led. The award for top trainer was changed from objective metrics (which Houston consistently led) to subjective criteria and suddenly the award, which Houston used to promote his services and had always belonged to whomever did the most sessions, was given to a younger trainer.

49. In early September 2024, when a client requested Houston as a trainer, Baker called Houston and made explicitly age-discriminatory comments, including: 1)"It's amazing what you do. Most people your age are slowing down;" 2) "We fully understand if you want to take it a little easier;" and 3)"There are so many young trainers happy to help out who could use the sessions."

50. When Houston informed Dignes about his goal to be in the top 50 trainers, she responded with similar age-discriminatory comments such as "[y]ou're already doing a lot. We don't want you to burn out," and "[i]t's amazing. Most people your age are retiring. This is a tough job."

51. Houston found these parallel comments particularly troubling, as they used nearly identical language, demonstrating a concerted effort to push him out based on his age.

52. On December 30, 2024, Dignes informed Houston that management refused to reinstate sessions for his clients, despite routinely reinstating sessions for clients of other trainers. This differential treatment appeared designed to lower Houston's session numbers and undermine his position at the club. After Houston pointed out this behavior was only aimed at him, Dignes relented.

**Termination and Retaliation (January 2025)**

53. On January 1, 2025, a client named Michael came in for a reinstated session with Houston and

brought his wife Jackie on a guest pass. After 10 minutes, Michael could not continue and cancelled the session. He then asked if Houston could give Jackie some pointers as he was free. Houston understood Jackie had signed an insurance waiver as a guest, and Houston helped her while Dignes looked on.

54. On January 2, 2025, Houston was called into the office by Dignes, with Marisa Pineda, an assistant manager, present. Dignes stated she was "furious" after watching Houston work briefly with Jackie and said: "I am your boss, you defied my orders. I have no choice but to write you up." Houston explained he had never received any orders not to help Jackie. Houston later learned from other trainers that their clients were typically able to gift sessions to their partners. Later that day, Scotece interrupted Houston's session with Paul Cellers.

55. On January 3, 2025, Scotece again interfered with Houston's session with his client Max Van Gilder. When Houston whispered to her to "stop interrupting my sessions," and then repeated it after she acted as if she couldn't hear him, Scotece became enraged and responded by saying "[oh yeah? Let's go to the managers," immediately threatening to report him for requesting she leave him alone. Upon information and belief, there are video cameras in the gym which record activities on the gym floor. The camera system in the gym from that day will show that Houston in no way blocked or otherwise interfered with Scotece's ability to do anything.

56. That same day, Houston met with Pineda and Dignes, during which meeting Dignes was apologetic about the circumstances with Jackie and no write-up was given to him to sign. During this meeting, Houston made his first explicit allegation of age discrimination, stating: "[i]t feels like you're singling me out, trying to lower my numbers because you think I'm too old to be the star trainer doing this many sessions."

57. Dignes denied the discrimination allegations and asked him to attend a meeting on January 6. Both Dignes and Pineda agreed that Houston could record the meeting.

58. On January 6, 2025, when Houston arrived for the scheduled meeting, Dignes and Pineda stated they "forgot" their agreement to allow recording. Kelly Baker arrived for the meeting also. Baker, who would be running the meeting stated that if Houston wanted to record the meeting, they would need People Services present, which Houston agreed to. Baker then cancelled the meeting but asked Houston if they could discuss matters. Houston was not willing to do so without a recording and explained that he wanted a record so that no one could misconstrue what was said, in reference to the two past meetings during which Baker falsely accused him of provoking member complaints. During this interaction, Houston made his second allegation of age discrimination, stating to Baker '[i]t seems that you don't want an old man to be the lead trainer so you're making things as difficult as you can for me here."

59. On January 8, 2025, Houston met with a People Services representative, Dignes, and Pineda. Baker was not present. During this meeting, Houston again explicitly stated that he was being subjected to age discrimination: "I'm almost 70 years old, you're treating me differently than everyone else," in reference to management not allowing his clients to reinstate sessions, by removing recognition that had always been in place for top trainers, and by creating a hostile work environment with constant undermining and comments about his age. He also stated that policies were being applied to him differently than to other trainers, with the goal being to lower his numbers and session count. He also recounted, at People Services request the entire Scotese/Allaway/Baker history.

60. During that meeting, he was asked about his interaction with Scotece on January 3, 2025 which Houston described as above, that he asked her to stay away from him in a whispered voice, nothing more.

61. On January 15, 2025, Houston was called to a meeting with Baker, Assistant Manager Brandon Richardson, and Alfred Kohart from People Services, during which he was terminated. The stated reasons were: 1) Defying a manager's order by providing a training session to Jackie, despite

Houston having never received any such order; 2) Accusing a manager of lying, due to Houston's desire that any meeting be recorded; and 3) Yelling at Scotece and blocking her way to the bathroom on January 3rd, despite Equinox possessing video footage that would prove no more serious interaction than as described above.

62. The third allegation inverted the actual harassment Houston had suffered and reported, making it particularly distressing to Houston. Houston had specifically complained previously that Scotece had blocked his path to the bathroom, trying to force him to make physical contact with her. Due to this documented history, management acted negligently by accepting Scotece's mirrored accusation against Houston without reasonable investigation of its discriminatory and retaliatory intent.

63. Management's decision to accept Scotece's allegations was unreasonable given that they had previously acknowledged Scotece's problematic behavior by directing her multiple times to have no interaction with Houston and also witnessed the pattern of Scotece's complaints following Houston's reports of her harassment.

64. Houston believes the actual reason he was terminated was the Scotece allegation provided the excuse sought by management to rid themselves of the older trainer who had recently complained of discrimination.

65. Upon being escorted from the building, Houston announced to Richardson that he intended to continue working with his clients who had previously requested to work with him away from Equinox, all of which previous requests he had turned down. To this Richardson said, "[f]ine."

**Post-Termination Retaliation**

66. On January 31, 2025, Houston was served with a cease-and-desist letter, based on non-compete and non-solicitation agreements in his contract with Equinox. The letter claimed Houston was bound by a 6-month non-compete agreement prohibiting work at any "Health and Fitness

13

Facility" within 3 miles of any Equinox location and a 12-month non-solicitation agreement prohibiting soliciting Equinox members.

67. The letter falsely alleged that Houston had solicited Equinox members to train with him at Studio IX (located near the Equinox West 76th Street location) prior to his termination. In reality, Houston had never solicited anyone to train with him prior to his separation and did not even know the name of Studio IX gym at the time of his termination.

68. Upon information and belief, no other trainers at the club were being targeted with enforcement of non-compete and non-solicitation agreements, despite multiple other former and current Equinox trainers training Equinox members at the Studio IX gym to the present day. This selective enforcement constitutes further retaliation for Houston's protected complaints.

69. Equinox initially sought to arbitrate their alleged claims regarding the restrictive covenants, filing a demand for arbitration with JAMS on May 6, 2025. However, JAMS declined to proceed with the arbitration after Houston informed them of the sexual harassment and retaliation claims at the heart of the dispute and indicated his willingness to seek an injunction should the arbitration proceed. As of the date of filing this Complaint, Equinox has not sought an order to compel arbitration and has slept on its rights to enforce its claims of competition and solicitation, despite knowledge of Houston's activities since January of 2025. As such, any enforcement of these restrictive covenants would prejudice Houston, as Defendants' inaction allowed him to believe that they had released the claim.

70. The combined effects of the persistent harassment and retaliation and managements' unwillingness to stop Scotece caused Houston to feel sexually harassed, controlled, threatened, invaded, violated, and other emotional distress. He developed chronic anxiety, difficulty sleeping, and persistent nightmares about confrontations with Scotece and management. These symptoms intensified after his termination and the aggressive pursuit of non-compete enforcement.

14

71. Houston is currently seeing a mental health therapist to address the emotional trauma caused by Defendants' conduct. The combination of age discrimination, sexual harassment, and retaliation has had profound effects on Houston's psychological well-being, self-confidence, and sense of professional identity.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
### Age Discrimination in Violation of the ADEA
### (Against Corporate Defendants)

72. Houston repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

73. Houston is over 40 years of age and was qualified for his position as a personal trainer, as evidenced by his exemplary performance record.

74. Corporate Defendants discriminated against Houston on the basis of his age by subjecting him to disparate treatment and a hostile work environment, including: (a) making explicit comments about his age and suggesting he should "slow down"; (b) changing performance metrics and recognition systems to disadvantage him once he became the top performer; (c) refusing to reinstate sessions for his clients while allowing such reinstatements for clients of younger trainers; (d) discouraging him from taking on new clients despite his superior performance; and (e) terminating his employment based on pretextual reasons.

75. Houston was harmed by Defendants' discriminatory conduct, including the loss of professional opportunities, emotional distress, humiliation, loss of dignity, interference with his ability to perform his job duties, and ultimately the loss of his employment.

76. The discrimination against Houston was willful, as evidenced by the explicit age-related comments and the concerted pattern of conduct aimed at undermining his success.

### SECOND CAUSE OF ACTION
### Sex/Gender Discrimination in Violation of Title VII
### (Against Corporate Defendants)

77. Houston repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

78. Houston was subjected to unwelcome harassment by Scotece based on his sex/gender.

79. The harassment was sufficiently severe or pervasive to alter the conditions of Houston's employment and create a hostile work environment, as evidenced by the years-long pattern of sexually-motivated harassment, physical boundary violations, and professional interference.

80. Scotece's harassment took on a dual character: (1) the overtly sexual nature of her unwanted physical contact and boundary violations, and (2) her retaliatory behavior through false complaints and professional sabotage when Houston rejected her advances.

81. Defendant Equinox knew of the harassment, as Houston repeatedly reported it to management, explicitly characterizing the conduct as sexual harassment in formal meetings.

82. Despite Houston's complaints, Defendants Equinox failed to take adequate remedial action to address the harassment, allowing it to continue for years, and negligently terminated him based on the false complaints of his harasser and are therefore liable for the actions of Scotece.

83. Defendant Equinox's failure to address the harassment was based, in part, on gender stereotypes and a belief that sexual harassment of a male employee by a female employee was not serious or worthy of intervention.

84. Houston was harmed by Defendant's discriminatory conduct, including the loss of professional opportunities, emotional distress, humiliation, loss of dignity, interference with his ability to perform his job duties, and ultimately the loss of his employment.

### THIRD CAUSE OF ACTION
### Retaliation in Violation of the ADEA
### (Against Corporate Defendants)

85. Houston repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

16

86. Houston engaged in protected activity by complaining about age discrimination to Defendants Dignes and Baker on January 3, 2025, January 6, 2025, and January 8, 2025.

87. Houston suffered an adverse employment action when he was terminated on January 15, 2025, just one week after his most explicit complaint of age discrimination.

88. There is a causal connection between Houston's protected activity and the adverse employment action, as evidenced by the close temporal proximity and the pretextual nature of the reasons given for his termination.

89. Houston was further retaliated against when Defendant Equinox selectively sought to enforce non-compete and non-solicitation agreements against him, despite the fact Equinox terminated Houston, while not enforcing similar agreements against other former trainers.

90. Houston was harmed by Defendant's retaliatory conduct, including the loss of professional opportunities, emotional distress, humiliation, loss of dignity, interference with his ability to perform his job duties, and ultimately the loss of his employment.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of Title VII
### (Against Corporate Defendants)

91. Houston repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

92. Houston engaged in protected activity by repeatedly complaining about sexual harassment by Scotece, including explicit complaints in September and November of 2023, and in early 2024 regarding Allaway's threatening retaliatory behavior.

93. Houston suffered an adverse employment action when he was terminated on January 15, 2025.

94. Defendants Equinox's acceptance of Scotece's allegations—which mirrored the exact complaints Houston had previously made about her—represent a departure from reasonable employment practices. The sudden reversal in credibility determination, choosing to believe Scotece over

17

Houston despite years of contrary evidence, demonstrates retaliatory motive and negligent management practices.

95. There is a causal connection between Houston's protected activity and the adverse employment action, as evidenced by Equinox's acceptance of Scotece's false claims and the use of those claims as a basis for termination.

96. Further, Equinox was aware of the retaliatory behavior that Houston was subjected to by Scotece, and allowed said behavior to continue. This is in contrast to their obligations to ensure such behavior is halted as soon as they are made aware of it.

97. Houston was harmed by Defendants' retaliatory conduct, including the loss of professional opportunities, emotional distress, humiliation, loss of dignity, interference with his ability to perform his job duties, and ultimately the loss of his employment.

## FIFTH CAUSE OF ACTION
### Discrimination in Violation of NYSHRL
### (Against All Defendants)

98. Houston repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

99. The NYSHRL prohibits discrimination in employment on the bases of age and sex/gender and is to be construed liberally in favor of plaintiffs alleging discrimination.

100. Defendants discriminated against Houston on the basis of his age in violation of the NYSHRL through the conduct described above.

101. Defendants Dignes and Baker directly participated in the discriminatory conduct through their explicit age-related comments, actions, and decisions regarding Houston's employment and are personally, directly and individually liable in that they aided and abetted the corporate defendants in their unlawful discriminatory acts against Houston, in violation of NYSHRL § 296.

102. Defendants discriminated against Houston on the basis of his sex/gender in violation of the

NYSHRL by allowing the conduct of Scotece to continue, as described above.

103. Defendant Scotece directly participated in the discriminatory conduct through her persistent harassment of Houston, which Equinox knew of and repeatedly failed to stop, is personally, directly and individually liable in that she aided and abetted the corporate defendants in their unlawful discriminatory acts against Houston.

104. Defendant Kohart, as a member of Equinox's People Services department, aided and abetted the sex/gender-based discriminatory conduct by failing to properly investigate Houston's complaints of sexual harassment, by disregarding the documented history of Scotece's harassment, and by ultimately participating in Houston's termination based on Scotece's false allegations despite having knowledge of her history of retaliatory complaints against Houston. Kohart is personally, directly and individually liable in that he aided and abetted the corporate defendants in their unlawful discriminatory acts against Houston.

105. Defendants Equinox failed to take reasonable steps to prevent and address the harassment despite having knowledge of its occurrence, and negligently terminated Houston on the say-so of his accuser.

106. Alternatively, in terms of the economic realities of the workplace, Individual Defendants, excepting Scotece, are personally, directly and individually liable as employers for the unlawful discrimination against Houston in violation of NYSHRL. Defendants' unlawful discriminatory acts caused plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

107. Houston was harmed by Defendants' discriminatory conduct, including the loss of professional opportunities, emotional distress, humiliation, loss of dignity, interference with his ability to perform his job duties, and ultimately the loss of his employment.

**SEVENTH CAUSE OF ACTION**
**Retaliation in Violation of NYSHRL**

19

**(Against All Defendants)**

108. Houston repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

109. The NYSHRL prohibits retaliation against employees who oppose discriminatory practices and is to be construed liberally in favor of plaintiffs alleging discrimination and retaliation.

110. Houston engaged in protected activity by complaining about age discrimination and sexual harassment on multiple occasions.

111. Defendants retaliated against Houston for engaging in the protected activity of complaining about age discrimination by terminating his employment and selectively enforcing a non-compete agreement.

112. Defendants Dignes and Baker directly participated in the retaliatory conduct through their actions regarding Houston's complaints and termination, and are personally, directly and individually liable in that they aided and abetted the corporate defendants in their unlawful retaliatory acts against Houston.

113. Defendant Scotece participated in the retaliation by continuing to stalk Houston, regularly interfering with Houston's ability to work, and upon learning of Houston's dispute with Dignes, using that opportunity to make false claims against Houston that were used as a basis for his termination and is personally, directly and individually liable in that she aided and abetted the corporate defendants in their unlawful retaliatory acts against Houston.

114. Defendant Kohart, as a member of Equinox's People Services department, aided and abetted the retaliatory conduct by participating in Houston's termination meeting on January 15, 2025, just one week after Houston's most explicit complaint of age discrimination. Kohart failed to conduct a reasonable investigation into the allegations against Houston, ignored the documented history of Scotece's false complaints, and ratified the pretextual reasons for termination despite knowledge

20

of Houston's protected complaints and is personally, directly and individually liable in that he aided and abetted the corporate defendants in their unlawful retaliatory acts against Houston.

115. Defendants Equinox's acceptance of Scotece's allegations—which mirrored the exact complaints Houston had previously made about her—represent a departure from reasonable employment practices. The sudden reversal in credibility determination, choosing to believe Scotece over Houston despite years of contrary evidence, demonstrates retaliatory motive and negligent management practices.

116. Alternatively, in terms of the economic realities of the workplace, Individual Defendants, excepting Scotece, are personally, directly and individually liable as employers for the unlawful retaliation against Houston in violation of NYSHRL. Defendants' unlawful retaliatory acts caused plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

117. Houston was harmed by Defendants' retaliatory conduct, including the loss of professional opportunities, emotional distress, humiliation, loss of dignity, interference with his ability to perform his job duties, and ultimately the loss of his employment.

**EIGHTH CAUSE OF ACTION**
**Age and Sex/Gender Discrimination in Violation of NYCHRL**
**(Against All Defendants)**

118. Houston repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

119. The NYCHRL prohibits discrimination in employment on the basis of age and sex/gender and is to be construed liberally in favor of plaintiffs alleging discrimination.

120. Defendants discriminated against Houston on the basis of his age and sex/gender in violation of the NYCHRL through the conduct described above.

121. Defendants Dignes and Baker directly participated in age-based discriminatory conduct through their comments, actions, and decisions regarding Houston's employment is personally, directly

and individually liable in that she aided and abetted the corporate defendants in their unlawful discriminatory acts against Houston.

122. Defendant Scotece directly participated in sex/gender-based discriminatory conduct through her harassment of Houston and is personally, directly and individually liable in that she aided and abetted the corporate defendants in their unlawful discriminatory acts against plaintiff.

123. Defendant Kohart aided and abetted both age and sex/gender-based discrimination by failing to properly investigate Houston's complaints, by disregarding the documented pattern of discrimination and harassment, and by actively participating in Houston's termination meeting despite the clearly pretextual nature of the allegations against him. The NYCHRL's liberal construction requires finding aiding and abetting liability where, as here, an individual in a human resources position actively participates in discriminatory conduct despite knowledge of protected complaints.

124. Defendant Equinox failed to take reasonable steps to prevent and address the discrimination despite having knowledge of its occurrence. Equinox's acceptance of Scotece's allegations—which mirrored the exact complaints Houston had previously made about her—represent a departure from reasonable employment practices. The sudden reversal in credibility determination, choosing to believe Scotece over Houston despite years of contrary evidence, demonstrates retaliatory motive and negligent management practices.

125. Houston was treated less well than other employees because of his age and sex/gender, in violation of the NYCHRL.

126. Alternatively, in terms of the economic realities of the workplace, Individual Defendants, excepting Scotece, are personally, directly and individually liable as employers for the unlawful discrimination against Houston in violation of NYCHRL. Defendants' unlawful discriminatory acts caused Houston to suffer economic damages, including lost wages as well as emotional

distress damages.

127. Houston was harmed by Defendants' discriminatory conduct, including emotional distress, humiliation, loss of dignity, interference with his job performance, and ultimately the loss of his employment.

**NINTH CAUSE OF ACTION**
**Retaliation in Violation of NYCHRL**
**(Against All Defendants)**

128. Houston repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

129. The NYCHRL prohibits retaliation against employees who oppose discriminatory practices and is to be construed liberally in favor of plaintiffs alleging retaliation.

130. Houston engaged in protected activity by complaining about age discrimination and sexual harassment on multiple occasions.

131. Defendants Equinox retaliated against Houston for engaging in protected activity by terminating his employment and aggressively enforcing a non-compete agreement.

132. Defendants Dignes and Baker directly participated in the retaliatory conduct through their actions regarding Houston's complaints and termination and are personally, directly and individually liable in that they aided and abetted the corporate defendants in her unlawful retaliatory acts against Houston.

133. Defendant Scotece participated in the retaliation by making false claims against Houston that were used as a basis for his termination and is personally, directly and individually liable in that she aided and abetted the corporate defendants in their unlawful retaliatory acts against plaintiff.

134. Defendant Kohart aided and abetted the retaliatory conduct by participating in Houston's termination meeting on January 15, 2025, just one week after Houston's most explicit age discrimination complaint. The NYCHRL is to be construed liberally to provide the greatest

protection for those facing discrimination and retaliation, and Kohart's failure to conduct a reasonable investigation while actively participating in Houston's retaliatory termination constitutes aiding and abetting under the City law. Kohart is personally, directly and individually liable in that he aided and abetted the corporate defendants in their unlawful retaliatory acts against Houston.

135. Alternatively, in terms of the economic realities of the workplace, Individual Defendants, excepting Scotece, are personally, directly and individually liable as employers for the unlawful retaliation against Houston in violation of NYCHRL. Defendants' unlawful retaliatory acts caused plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

136. Houston was harmed by Defendants' retaliatory conduct, including loss of income, professional opportunities, and emotional distress.

### TENTH CAUSE OF ACTION
### Declaratory Relief - Non-Compete Agreement
### (Against Defendant Equinox)

137. Houston repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138. An actual controversy exists between Houston and Defendant Equinox concerning the enforceability of the non-compete and non-solicitation agreements that Defendant Equinox is attempting to enforce against Houston.

139. The non-compete agreement, which purports to prohibit Houston from working at any "Health and Fitness Facility" within 3 miles of any Equinox location for a period of 6 months, is unreasonably broad in geographic scope and imposes an undue hardship on Houston's ability to earn a living in his chosen profession.

140. The non-compete agreement is unreasonably broad in geographic scope. Equinox operates more than 40 locations throughout New York City and its surrounding boroughs, with facilities in nearly

every major neighborhood. The 3-mile radius restriction from any Equinox location effectively creates a complete ban on Houston working anywhere in New York City in his chosen profession. This restriction is particularly onerous given Houston's age and the specialized nature of his work, making relocation to a different market impractical and effectively ending his career.

141. The non-solicitation agreement, which purports to prohibit Houston from soliciting Equinox members for a period of 12 months, is being enforced in a discriminatory and retaliatory manner against Houston while not being enforced against other former trainers.

142. Defendant Equinox is enforcing these agreements against Houston in retaliation for his protected complaints of discrimination and harassment.

143. Defendant Equinox has no legitimate business interest that would justify the enforcement of these overbroad restrictions against Houston.

144. Houston seeks a declaration that the non-compete and non-solicitation agreements are void and unenforceable as a matter of law, public policy, and by the failure of Equinox to seek redress in a timely manner, allowing any claimed damages to accrue.

## **PRAYER FOR RELIEF**

WHEREFORE, Houston respectfully requests that this Court enter judgment in his favor and against Defendants, and award him the following relief:

a) A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

b) A declaratory judgment that the non-compete and non-solicitation agreements between Houston and Equinox are void and unenforceable;

c) An injunction and order permanently restraining Defendants from enforcing the non-compete and non-solicitation agreements against Houston;

d) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Houston for all monetary and/or economic damages, including but not limited to the loss of past and future income, wages, compensation, job security, and other benefits of employment;

e) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Houston for all non-monetary and/or compensatory damages, including but not limited to compensation for emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering;

f) An award of liquidated damages pursuant to the ADEA;

g) An award of punitive damages in an amount to be determined at trial;

h) An award of costs that Houston has incurred in this action, as well as Houston's reasonable attorneys' fees; and

i) Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Houston hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
August 20, 2025                                    Respectfully submitted,

                                                   Geoffrey Kalender
                                                   Geoffrey Kalender, PC
                                                   447 Broadway 2nd Floor
                                                   New York, NY 10013
                                                   gk@employmentlawgk.com
                                                   Attorney for Plaintiff